# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND,[1] KRAUSS,[2] and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist GARNARD W. BURNSIDE**
**United States Army, Appellant**

ARMY 20130193

Headquarters, 21st Theater Sustainment Command
Reynold P. Masterton, Military Judge
Lieutenant Colonel Sean C. McMahon, Acting[3] Staff Judge Advocate

For Appellant:  Mr. William E. Cassara, Esquire (argued); Captain Timothy J. Kotsis, JA; Mr. William E. Cassara, Esquire (on brief); Captain Patrick J. Scudieri, JA.

For Appellee:  Captain Jaclyn E. Shea, JA (argued); Major A.G. Courie III, JA; Major John K. Choike, JA; Captain Jaclyn E. Shea, JA (on brief).

6 August 2015

----------------------------------
OPINION OF THE COURT
----------------------------------

PENLAND, Judge:

A panel with enlisted representation sitting as a general court-martial convicted appellant, contrary to his pleas, of three specifications of rape and one specification of assault consummated by a battery in violation of Articles 120 and 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 920, 928 (2012).  The panel sentenced appellant to a dishonorable discharge, confinement for

---

[1] Senior Judge LIND took final action in this case prior to her retirement.

[2] Judge KRAUSS took final action in this case prior to his retirement.

[3] We note that the pretrial advice was signed by the "Deputy Staff Judge Advocate."  Rule For Courts-Martial (R.C.M.) 406 requires the staff judge advocate to personally sign the pretrial advice.  We hold such error harmless in this case.

two years, forfeiture of all pay and allowances, and reduction to E-1.  The convening authority approved the adjudged sentence.

We review this case under Article 66, UCMJ.  Appellant raises two assignments of error.  His first assigned error alleging the military judge abused his discretion when he denied the defense motion to suppress appellant's sworn statement taken in violation of the Fifth Amendment and Article 31, UCMJ, because US Army Criminal Investigation Command (CID) Special Agents (SA) PS and RW failed to scrupulously honor appellant's invocation of the right to remain silent, merits discussion and relief.  We have considered matters personally submitted pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); they are without merit.[4]

We hold the military judge abused his discretion, resulting in prejudice, when he denied appellant's motion to suppress his oral and written statements to CID agents, who failed to scrupulously honor appellant's invocation of his constitutional right to remain silent and obtained involuntary statements from him.  We grant relief in our decretal paragraph.

## BACKGROUND

On 22 August 2012, appellant's spouse, NB, contacted military police (MP) in Heidelberg, Germany, and alleged that appellant assaulted her.  Military Police authorities forwarded this information to appellant's commander, who ordered a subordinate officer to take appellant to the MP Investigations (MPI) office at Kapaun Air Station the next day.  At 0900 on 23 August 2012, appellant was taken to the MPI office, where Investigator (INV) RJ advised appellant that he suspected him of assault; INV RJ further advised appellant of his rights to silence and counsel, which he waived.  For two hours, appellant talked to INV RJ about a physical altercation with NB, but appellant explicitly told him he did not want to provide a written statement.  Appellant told INV RJ that: toward the end of the altercation, he made sexual advances toward NB; NB said "no" multiple times, then ultimately said, "[d]o whatever you want with me," after which appellant engaged in sexual activity with NB.

Hearing appellant's characterization of this sexual encounter, INV RJ asked no more questions but allowed him to continue talking.  When appellant finished, INV RJ excused himself and called the MP noncommissioned officer (NCO) who received NB's initial complaint.  Investigator RJ asked the NCO whether NB had mentioned any sexual activity regarding appellant on the night of their physical altercation; NB had not.

---

[4] Resolving this case in light of the Fifth Amendment, we need not address Article 31 or appellant's second assignment of error.

Investigator RJ then contacted SA PS at the CID office in Kaiserslautern and requested CID assume authority for the investigation. Special Agent PS agreed to take over and told INV RJ he would come to the MPI office. However, understanding INV RJ had developed rapport with appellant during their two-hour interview, SA PS instructed INV RJ to again advise appellant of his rights to counsel and silence for the offense of rape using Department of the Army Form (DA) 3881 and continue interviewing him.

Investigator RJ followed SA PS's guidance and re-advised appellant, who invoked his right to silence upon learning he was now a rape suspect. At 1147 hours on 23 August 2012, appellant checked the block on the DA 3881 Form next to the words, "I do not want to be questioned or say anything." Investigator RJ contacted SA PS again and informed him of appellant's invocation. Special Agent PS responded he was en route to INV RJ's office.

Special Agent PS arrived at the MPI office a few minutes later, and INV RJ briefed him again on his interview with appellant. Investigator RJ and another MP Investigator drove appellant to the Kaiserslautern CID office approximately twenty minutes away on Kleber Kaserne. Appellant was transferred into CID custody, and after multiple hours of "administrative processing," SA PS again advised him of his rights to silence and counsel, again using a DA Form 3881 to inform him he was suspected of rape. Special Agent PS informed appellant that, because another law enforcement agency had previously advised him of these rights, CID was required to advise him anew. Appellant waived his rights to silence and counsel at 1545 on 23 August 2012 and began his interview with SA PS, during which he admitted to facts amounting to rape and assault consummated by battery. After appellant said multiple times that he would not provide a written statement, SA PS ended the interview and prepared to release him to his unit.

At 2030 hours on 23 August 2012, CID agents informed appellant's unit that he was ready to be picked up. Sergeant ED was tasked with this escort duty and he arrived at the CID office at 2100. A CID official met him in the entry foyer and told him appellant was completing some paperwork and would be ready to leave in a few minutes. About fifteen minutes later, another CID official came into the foyer and told SGT ED "that they were still trying to finish some things up and it would be just a little bit longer." After the second CID official returned to the office interior, SGT ED heard appellant speaking with the CID officials. Sergeant ED heard CID officials tell appellant that it "would only help him if he would tell them what happened." He also heard appellant say he "did not want to, that he told them everything he wanted to . . . . [h]e was tired" and "just done." Criminal Investigation Command officials told SGT ED to leave and that CID would call him when appellant was ready to leave. Special Agent RW then spoke with appellant. Between 2100 on 23 August 2012 and 0509 on 24 August 2012, appellant provided

3

SA RW with a written statement. Appellant's oral statements to SA PS and written statement to SA RW were used against him in his court-martial.

## A. *Motion to Suppress*

The defense filed a motion to suppress appellant's oral and written statements to CID because CID failed to scrupulously honor appellant's invocation of his right to silence to MPI INV RJ. The military judge held an Article 39(a) session to litigate the motion on 5 February 2013. The government approached its interlocutory burden of proof by introducing summarized testimony from SA PS and SA RW given at appellant's Article 32 investigation. At the Article 32 investigative hearing, SA PS testified, according to the summarized transcript, he was aware appellant had invoked his right to silence at the MPI office, however "since [appellant] invoked his right to not speak with an [sic] Military Police Investigation Investigator, we would re-advise him and see if he would like to make a verbal or written statement to our office . . . . The rights [appellant] was provided were by Military Police Investigations which is a separate investigative agency, which was earlier in the morning." Special Agent PS testified, again according to the summarized transcript, appellant was willing to give an oral statement to him about the alleged rape of NB but he refused to provide a written statement. At that point SA PS decided to end the interview and arranged to have SGT ED retrieve appellant. Special Agent PS also testified at the Article 32 that when completing administrative processing to release appellant, appellant complained that SA PS's words would represent "his story." Special Agent RW was leaving the building and overheard appellant. Special Agent RW told appellant he could put his story in writing "your words, your story." Appellant then agreed to make a written statement.

Special Agent RW's summarized Article 32 testimony states that he saw appellant in the CID processing room. Special Agent RW introduced himself as "with the Kaiserslautern office for the Special Victim's unit" and SA RW believed appellant knew he was a CID agent. Appellant asked him "what he needed to do next." Special Agent RW told appellant the next step was to provide a written statement which could be that night or the next day. Appellant followed SA RW out of the room and told him he wanted to provide a written statement that evening, which he did.

The defense called MPI INV RJ, MPI INV TJ, SGT ED, and appellant to testify. Investigator RJ testified he set up appellant's appointment with MPI on 23 August 2012 to discuss the alleged assault of NB. Appellant waived his rights to silence and to an attorney and agreed to give a verbal statement but not a written one. When appellant made rape admissions, INV RJ called SA PS and briefed him on the situation. Special Agent PS told INV RJ to advise appellant of his rights because he and appellant had built a good rapport and SA PS thought it would be "easier for [INV RJ] to get through the form with [appellant]." Investigator RJ

4

advised appellant of his rights for being a suspect of committing a rape.  Appellant signed the DA 3881 form invoking his right to remain silent.  Shortly thereafter SA PS arrived and appellant was transported to the CID office.[5]

Sergeant ED testified he received a call at approximately 2030 hours on 23 August 2012 from CID that appellant was ready for pick up.  Sergeant ED drove to CID and arrived in approximately fifteen minutes.  He waited for approximately fifteen minutes when a CID agent advised him they were finishing up with appellant and it would be just a little longer. SGT ED heard a conversation between a CID agent and appellant that "it would only help them if he would tell them what happened."  Appellant repeatedly replied he "told them everything he wanted to.  He just wanted—or he was tired, he was just done."  A few minutes later, a CID agent told SGT ED that appellant changed his mind and wanted to continue to talk to CID and that SGT ED should leave and come back later.  Sergeant ED left and received a telephone call at approximately 0430 hours on 14 August 2012 to come to CID and pick up appellant.  When he arrived, appellant looked "a bit bedraggled . . . . [E]xtremely tired . . . . a bit anxious about everything that happened."

Finally, appellant testified for the motion.  He testified that he was ordered to go to MPI and that he agreed to give an oral statement about the assault allegation but did not want to give a written statement.  When advised of his rights for rape, appellant testified he told INV RJ he had "nothing to discuss about that" and checked the block on the DA 3881 form indicating he did not want to be questioned.  Appellant was then transported to CID and was not free to leave.  At CID, appellant was administratively processed then taken to an interview room.  Special Agent PS advised appellant of his rights stating appellant had to complete the rights advisal form because it was a different form than used by MPI, the earlier rights advisal form he completed at MPI "didn't count," and SA PS instructed him to sign the form acknowledging that he would be talking to SA PS without a lawyer.  Appellant spoke with SA PS for five to six hours but refused to give a written statement.  Then, while appellant was in the processing room pending release, he was approached by SA RW who "introduced himself as a special victims [sic] guy."  Appellant replied "so you are the Family Advocate Program representative that I am supposed to meet with."  Special Agent RW answered "yes' and told appellant he needed to get appellant's statement and that SA RW had nothing to do with the investigation.  Special Agent RW told appellant he needed the statement that evening and that appellant should not rely on SA PS's words to tell his story. Appellant testified SA RW told him that he needed to make a written statement because "the statement would be going to a panel for like a case review and because I am African-American . . . it was important for me to write down in my own words what happened because the people on this panel don't reflect African-Americans." Appellant then made a written statement.  On cross-examination appellant testified SA RW did not say his statement would go

---

[5] Military Police Investigator TJ testified consistently with MPI INV RJ.

to a case review panel that discriminated against African-Americans but that was "the impression of what he was implying."

*B. The Military Judge's Ruling*

In an email dated 11 February 2013, the military judge ruled:

> I have decided to deny the defense's suppression motion. Below is a summary of my findings; I may provide more detailed findings at trial.[6]
>
> The defense has asked me to suppress certain oral and written statements made by the accused to CID agents on 23 and 24 August 2012. Based on the defense motion [App. Ex. III] and government response [App. Ex. IV] and the evidence submitted by the parties I find and rule as follows:
>
> 1. The accused is charged with rape and assault of his wife, [NB], on 22 August 2012.
>
> 2. On the early morning of 22 August, [NB] contacted the military police to report a domestic incident involving her husband, the accused. The accused's chain of command ordered the accused to report to Military Police Investigations office (MPI) early in the morning of 23 August to be questioned regarding the incident.
>
> 3. The accused was escorted to MPI on the morning of 23 August. The accused was read his rights for assault by MPI Investigator [RJ], using a Rights Warning Waiver Certificate, DA Form 3881 [App. Ex. III, Encl. 1]. The accused voluntarily waived his rights, agreeing to talk about the incident. The accused explained that he and his wife had been involved in a mutual affray. MPI Investigator [TJ] was also present for portions of the interview. The accused refused to make a written statement. At the end of the interview the accused explained that he had sex with his wife and she said "no – no – no" and then "do what you want with me."
>
> 4. Suspecting the accused of rape, [INV RJ] realized that the case was no longer within the purview of MPI. The

---

[6] The military judge did not supplement his ruling.

relevant Army regulations provide that assault allegations will be investigated by MPI, while rape allegations should be investigated by the Army Criminal Investigation Division [sic] (CID). [Investigator RJ] contacted CID and made arrangements to transfer the accused to their office for processing. CID [sic] told [INV RJ] to go ahead and read the accused his rights for rape, since [INV RJ] was already in the process of interviewing the accused.

5. When [INV RJ] read the accused his rights for rape at approximately 1147, again using a DA Form 3881 [App. Ex. III, Encl. 2], the accused invoked his right to remain silent, explaining that he did not want to discuss his private sexual life. The accused did not invoke his right to an attorney and at no time asked for an attorney. The accused was simply not interested in talking to [INV RJ] about the rape allegation at that time. The accused checked the block at the bottom of the form indicating that he did not want to be questioned; he did not check the block asking for a lawyer. [Investigator RJ] immediately stopped questioning the accused and continued making arrangements to transport the accused from his office to the CID office, which was on another military installation a short distance away. [Investigator RJ] informed CID that the accused had invoked his right to remain silent.

6. [Investigators RJ and TJ] subsequently transported the accused to the CID office where the accused was processed, as required. This processing included, among other things, the taking of fingerprints, mug shots and the collection of a DNA sample and administrative data. The accused was read his rights for rape by [SA PS] of CID at approximately 1545, again using a DA Form 3881 [App. Ex. III, Encl. 6]. This time he waived his rights and agreed to talk to CID. The accused made a number of statements to CID and eventually gave a full written statement. The written statement was completed at approximately 0509 [hours] on 24 August [App. Ex. III, Encl. 8]. At no time during the interview with CID did the accused ask for an attorney or even hint that he wanted an attorney. He wanted to orally tell his side of the story to CID and eventually wanted to put his story in writing. This took a long while, but the accused was never coerced to provide a statement, either written or oral.

7. Between the time that the accused initially invoked to remain silent to MPI and the time he waived his rights to CID, approximately four hours had passed. The accused was transported to CID only because this was required by Army regulations and not in an effort to subvert his right to remain silent. The accused was in a different location, the CID office, and was being questioned by a different investigator, [SA PS], when he waived his rights at 1545.

8. The accused testified at the motions hearing that he was under the impression that he had to talk to MPI and CID. I do not find this [testimony] to be credible; it is contradicted by the rights warnings he was given. I find that the accused was properly advised of and understood his rights to remain silent and to speak with an attorney. The accused also testified that [SA RW] mis-identified himself as a "special victims" person, implying that he was working for a family advocacy agency rather than law enforcement. I do not believe the accused on this point; [SA PS] clearly identified himself as a CID agent in the Rights Warning Waiver Certificate completed at 1545. The accused also testified that CID failed to give him breaks and gave him nothing to eat or drink during his questioning, other than a single bag of chips and a small bottle of water. I do not find this testimony to be completely credible. In the accused's sworn statement he admitted that he had been given breaks and that he had been given nutrition, beverages, and breaks. Although the accused testified that CID simply made up the answers to these questions, I do not believe the accused's testimony on this point. I believe the testimony which [SA PS] gave at the Article 32 investigation (enclosure 5 of AE III) that the accused was given several breaks and was approached several times and offered food and water; all the accused asked for was water and chips. I find that the accused was provided reasonable breaks and received all the food and water that he requested. I also find that the accused was willing to give his side of the story by talking to the CID agents. I find that the accused's statements to CID, both oral and written, were voluntary.

9. I find that neither the accused's right to remain silent under the Fifth Amendment [*see Michigan v. Mosley*, 423 US 96 (1975)] nor his Article 31 rights [*see United States v. Watkins*, 34 MJ 344 (C.M.A. 1992)] were violated when

> CID re-advised the accused of his rights four hours after he had invoked his rights to remain silent to MPI investigators. I also find that the accused's subsequent statements to CID were voluntary.

> 10. Based on the forgoing, the defense motion is denied.

## LAW

"A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion." *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015) (quoting *United States v. Jasper*, 72 M.J. 276, 279 (C.A.A.F. 2013)). "A military judge abuses his discretion if 'his findings of fact are clearly erroneous or his conclusions of law are incorrect.'" *Id.* (quoting *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014)).

In response to appellant's motion to suppress, "the prosecution [had] the burden of establishing the admissibility of the evidence." Military Rule of Evidence [Mil. R. Evid.] 304(e). "The military judge must find by a preponderance of the evidence that a statement made by the accused was made voluntarily before it may be received into evidence." Mil. R. Evid. 304(e)(1). "If a person chooses to exercise the privilege against self-incrimination . . . questioning must cease immediately" Mil. R. Evid. 305(f)(1). Non-compliance with Mil. R. Evid. 305(f) renders a statement involuntary. Mil. R. Evid. 304(a). "The military judge's determination that a confession is voluntary is a question of law, requiring independent, *i.e., de novo*, review." *United States v. Ford*, 51 M.J. 445, 451 (C.A.A.F. 1999) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)); *see also United States v. Bubonics*, 45 M.J. 93 (C.A.A.F. 1996).

The privilege against self-incrimination is a fundamental Constitutional right. "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the U.S. Supreme Court established required warnings in order to improve compliance with that right. The warnings included pre-interrogation notice of the right to remain silent. *Miranda* further established that such a person's statements could be used only after the prosecution demonstrated he was notified of these rights and knowingly and intelligently waived them, adding, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

In *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), our superior court adopted the rights warnings of *Miranda* for trials by courts-martial. Necessary corollaries from the rights warnings entitlements include the one at the heart of appellant's case: "[i]f the individual indicates . . . prior to or during

questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-474. This common law principle developed into the enduring restatement in *Michigan v. Mosley*, 423 U.S. 96 (1975): "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104. Applying *Mosley* to courts-martial, our superior court described what may be described as a totality of the circumstances analysis in *United States v. Watkins*, 34 M.J. 344 (C.M.A. 1992):

> Whether there is a violation of *Miranda* by approaching an individual after invoking his rights depends on which right was invoked, who initiates communication, the subject matter of the communication, when the communication takes place, where the communication takes place, and the time between invocation of the right and the second interview.

*Id.* at 345.

Whether a suspect is in custody for purposes of *Miranda* warnings is a "*de novo* question of law to be decided on the basis of the facts found by the factfinder (the CCA)". *United States v. Catrett*, 55 M.J. 400, 404 (C.A.A.F. 2001) (citing *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995)).

## ANALYSIS

We respect the primacy of the military judge in deciding interlocutory matters such as these and do not hastily substitute our own judgment for his, because "[t]he abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. Jones*, 73 M.J. 357, 360 (C.A.A.F. 2014) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000)); *see also United States v. Flesher*, 73 M.J. 303 (C.A.A.F. 2014) (abuse of discretion occurs when a "military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law."). However, we give less deference to the military judge when his conclusions of law are based on incomplete findings of fact. *United States v. Collier*, 67 M.J. 347, 353 (C.A.A.F. 2009)(citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)).

The military judge's ruling did not address two decisive matters: appellant's unambiguous invocation of his right to remain silent and SGT ED's testimony. The ruling did not conclude whether appellant unambiguously invoked his right to silence in response to INV RJ's warning that he suspected him of raping NB. The ruling did not mention appellant's multiple invocations of his right to silence at the CID office. This claim was an essential point for the military judge to consider; if

appellant did not unambiguously invoke, Army law enforcement would have been free to interrogate him. We reject the government's arguments on appeal that appellant ambiguously invoked at the MPI office. In its brief, the government emphasizes appellant's statements in response to the second rights warning: "I'm confused. I am not sure why it is going this way. I am not sure why CID is getting involved. . . . I just don't want to talk to you. I don't want to write a statement." Assuming *arguendo* that these last two sentences were ambiguous, appellant resolved any doubt on the matter when, in the presence of two MPI investigators, he checked the block next to the words, "I do not want to be questioned or say anything." The government asserts that SA PS knew appellant "had elected that he did not want to speak to [MPI]," but it was unclear whether appellant had invoked his right to not speak with a CID agent. This argument is unpersuasive.[7] The right to remain silent in a criminal case emanates from the Constitution, not individual law enforcement offices or agents.

The ruling did not mention SGT ED's testimony. Sergeant ED was the most objective, disinterested witness relevant to the matter of appellant's experience at CID. During the night of 23 August 2012, SGT ED heard multiple CID agents pressuring appellant to submit a written statement, despite his continued protests that he had already told them everything he had to say and wanted to leave the CID office. Appellant was noticeably fatigued when he was released from CID custody at around 0500 hours the next morning—very shortly after signing the written statement. The military judge could not make reliable conclusions of law without evaluating the testimony of SGT ED.[8]

---

[7] We note the following from trial counsel's written response to the motion to suppress: "The Accused *explicitly invoked his right to remain silent* by selecting the appropriate box on the DA Form 3881. . . ." (emphasis added).

[8] The military judge's ruling did address appellant's claim that SA RW mis-identified himself as a Family Advocacy representative, but the underlying logic is somewhat unclear. The military judge found, "I do not believe the accused on this point; [SA PS] clearly identified himself as a CID agent in the Rights Warning Waiver Certificate completed at 1545." However, we are unable to discern how SA PS's self-identification during the previous rights warning at 1545 hours is probative of whether SA RW truthfully identified himself several hours later.

The military judge's ruling did not explicitly address appellant's claim that SA RW invoked race in his effort to obtain a written statement. We note that, if credible, this allegation would indicate "unwarranted references to race or ethnicity

(continued . . .)

In evaluating the motion to suppress and the evidence before the military judge, we conclude that while in law enforcement custody, appellant unambiguously invoked his right to remain silent with respect to the rape allegation against him. Applying the *Watkins* factors, we further hold that SA PS and SA RW did not scrupulously honor appellant's decision to remain silent. We note first that after appellant invoked his right to silence to INV RJ, he remained in the inherently coercive atmosphere of law enforcement custody and interrogation. Appellant was transported from MPI's interrogation room to CID's interrogation room. Approximately four hours later, SA PS initiated the communication with appellant by again advising him of his rights to silence and counsel, telling him, in so many words, that the previous rights warning and his invocation were of no legal effect.

The record demonstrates that SA PS, rather than acknowledge appellant's invocation of his right to silence to INV RJ or simply ask appellant whether he would be willing to speak with CID despite his previous invocation, suggested that the previous invocation did not mean anything, advised him again and questioned him regarding the same rape allegation of which INV RJ previously informed appellant. This fact in conjunction with the totality of the circumstances, including the agents' subsequent disregard of appellant's repeated requests to cease the interrogation, informs our conclusion that CID failed to scrupulously honor appellant's right to remain silent. By logic, telling a suspect his previous invocation of a right is invalid cannot be somehow equivocated to "scrupulously honoring" that same invocation. To the opposite, the CID agents did nothing but dishonor or invalidate the previous invocation. Appellant's subsequent waiver of that right was involuntary under *Miranda*. Accordingly, the military judge erred in denying the defense motion to suppress appellant's oral statements to SA PS and appellant's written statement to SA RW.

We acknowledge SA PS's explanation that, as a law enforcement agency distinct from MPI, CID was required to re-administer the rights warnings. His logic was objectively inconsistent and unsupported by the facts. The record establishes that SA PS instructed INV RJ to re-advise appellant and continue interviewing him in response to the allegation of rape. If appellant had waived his rights and spoken to INV RJ about the rape allegation, CID would have honored that decision. However, CID refused to honor appellant's decision to invoke. Army law enforcement authorities cannot have it both ways.

---

(. . . continued)

[that] have no place in either the military or civilian forum." *United States v. Rodriguez*, 60 M.J. 87, 89 (C.A.A.F. 2004). If credible, the allegation would also indicate unlawful psychological coercion probative of whether CID agents scrupulously honored appellant's constitutional right to silence and whether his written statement was voluntary.

Our reasoning with respect to the constitutional violation surrounding appellant's oral statements to SA PS applies equally to the written statement that SA RW obtained. The military judge made conclusions of law without considering the testimony of SGT ED, an objective, disinterested witness. During the night of 23 August 2012, he heard multiple CID agents pressuring appellant to submit a written statement, despite appellant's continued protests that he had already told them everything he had to say and wanted to leave the CID office. It is only after SGT ED heard this discussion that appellant gave his written statement to SA RW. Based on these facts, we conclude as a matter of law that SA RW did not scrupulously honor appellant's constitutional right to remain silent under *Mosley*.

Considering the constitutional error in this case, we assess whether it was harmless beyond a reasonable doubt. *United States v. Mott*, 72 M.J. 319, 332 (C.A.A.F. 2012) (citing *United States v. Paige*, 67 M.J. 442, 449 (C.A.A.F. 2009)). Constitutional error "[is] not harmless beyond a reasonable doubt if 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Id.* at 332 (quoting *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) and *Chapman v. California*, 386 U.S. 18, 24 (1967)). We also are mindful that "[e]rroneous admission of a confession 'requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.'" *Id.* at 332 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)). There is no reasonable possibility that appellant's admissions to SA PS and SA RW contributed to his conviction for assault consummated by a battery. These statements were cumulative with appellant's properly admitted statement to INV RJ. There is, however a reasonable possibility that appellant's statements to SA PS and SA RW contributed to appellant's convictions of the three specifications of rape where—in its opening statement, case-in-chief, closing and rebuttal arguments—the government prominently emphasized statements obtained in violation of the Fifth Amendment and where the panel's findings were remarkably consistent with admissions in those statements.

## CONCLUSION

The findings of guilty to Specifications 1, 2, and 3 of Charge I and Charge I are set aside. The remaining findings of guilty are AFFIRMED. The sentence is set aside. A rehearing may be ordered by the same or a different convening authority. *See generally* R.C.M. 810. All rights, privileges, and property, of which appellant has been deprived by virtue of the findings and sentence set aside by this decision are ordered restored. *See* UCMJ arts. 58a(b), 58b(c), and 75(a).

Senior Judge LIND and Judge KRAUSS concur.

13



FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court